## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **DONNA GAIL GORDON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **5:04CV124 (DF)** |
| | : | |
| **DOOLY COUNTY SCHOOL** | : | |
| **DISTRICT; MELVILLA WEST;** | : | |
| **WAYNE WILKIN; EDDIE** | : | |
| **ALMOND; VERLIN JONES, JR.;** | : | |
| **and JANIE WINTERS, in each of** | : | |
| **their individual and official** | : | |
| **capacities as elected officials for** | : | |
| **the Dooly County Board of** | : | |
| **Education,** | : | |
| | : | |
| **Defendants.** | : | |

## O R D E R

On April 23, 2004, Plaintiff Donna Gail Gordon sued the Dooly County

School District and all five members of the Dooly County Board of Education

in their official and individual capacities under 42 U.S.C.A. §§ 1981, 1983, 1985,

and 1986 and under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e,

alleging that she was denied employment opportunities because of her race.

Currently before the Court is the defendants' motion for summary judgment

(doc. 25), which, for the following reasons, is granted.[1]

---

[1] In her response to the defendants' summary-judgment motion, Gordon concedes
that her § 1985 and § 1986 claims fail as a matter of law. The Court therefore grants

# I.  BACKGROUND

Plaintiff Donna Gail Gordon, a former employee of Defendant Dooly County School District ("District"), is a white female.[2]  In 2003, she applied for a promotion to two different jobs in the Dooly County public school system: (1) Principal of Dooly County Middle School, and (2) Assistant Superintendent of Transportation, Facilities and Student Management ("Assistant Superintendent").  She was not promoted to either one.  Gordon was instead named the Assistant Principal of Dooly County Middle School.  She contends that she was passed over for both promotions because of her race.

Gordon's employment with the District began in 1999 when she was hired to serve as Assistant Principal for Instruction and Curriculum for the 1999-2000 school year.  In that capacity, Gordon worked under two principals—Dr. Oneida Ingram, a black female, and Dr. Bobby West, a black male—but did not have a particularly amicable working relationship with either of them.  Their relationships suffered from communication problems and accusations that Gordon undermined the authority of her superiors.  She held the position of Assistant Principal for two

---

summary judgment to the defendants on those claims without further discussion.

[2] Because Gordon's suit involves a claim of racial discrimination, the Court will identify the races of the school personnel mentioned throughout this Order.

years before being transferred to the Central Office by then-Superintendent of the Dooly County School District Beauford Hicks, a black male.  Hicks's decision to relocate Gordon was precipitated at least in part by the deterioration of Gordon's working relationship with West and various members of the Dooly County Middle School faculty.  While at the Central Office, Gordon worked under the supervision of Margie Carr, a white female who served as the District's Assistant Superintendent for Curriculum and Instruction.  The two got along well enough, but Carr observed that Gordon had trouble interacting with various members of the staff.

When the Assistant Principal of Vienna Elementary School resigned, Hicks assigned Gordon to that post for the 2002-2003 academic year.  There she worked under the supervision of Dr. Tom Collins, a white male.  Gordon's relationship with Collins was better than the relationship she had previously had with West or Ingram, but according to Carr, her personality and conduct alienated members of the faculty and staff.

The District suffered budget cutbacks in the Spring of 2003 caused by reduced funding from the State of Georgia.  In response to the funding shortfall, and the simultaneous closing of two elementary schools, Hicks and the board of

education decided to take two precautionary measures designed to ensure that the District continued to function efficiently:  They developed a retirement-incentive plan for eligible employees and considered various proposals for restructuring the District's administrative composition.  These proposals stirred debate among the board members.

Based on a systemwide organizational plan and a number of projected retirements, Hicks made several preliminary decisions about who should fill various administrative positions.  He tentatively decided to recommend the following individuals for the following spots: (1) Dr. Daniel Sturdivant for Principal of Dooly County Middle School; (2) Dr. Bobby West for Director of Transportation, Maintenance, Safety, and Student Management; and (3) Gordon for Assistant Principal of Dooly County Middle School.  Hicks, as it turned out, never had an opportunity to make these recommendations to the school board because, once he learned that his contract was not being renewed, he resigned his post as Superintendent.  He resigned at a board meeting on May 19, 2003.  At the same meeting, the members of the school board chose Willie Davis to serve as the District's Interim Superintendent while a formal search was conducted to find a replacement for Hicks.  Davis, approaching the end of a nearly forty-year career in

education, did not particularly relish the idea of serving as Interim Superintendent, but agreed to do so.

Davis's most recent position in the District, as Assistant Superintendent for Transportation, Facilities, and Student Management, did not require him to make the kinds of personnel decisions he would be responsible for as Interim Superintendent.   Nevertheless, as a matter of Georgia law,[3] it fell to Davis to recommend to the board of education individuals to fill the administrative vacancies resulting from the District's restructuring.  Davis resolved to make his recommendations with an emphasis on timeliness, as the District, which operates on a year-round schedule, was set to begin classes on July 18.

After considering potential candidates for each position, Davis planned to make his final recommendations to the board at its meeting on July 24, 2003. Davis recommended the following: (1) Dr. Sturdivant for Principal of Dooly County Middle School ("Principal"); (2) Gordon for Assistant Principal of Dooly County Middle School; (3) Cathy Jones, a white female, for Principal of Dooly County Elementary School; (4) Felicia Lewis, a black female, for Assistant Principal of Dooly County Elementary School; (5) Dr. Sandra Ferguson, a white female, for

---

[3] *See* O.C.G.A. § 20-2-211 (Lexis 2005).

Director of Elementary and Middle School Curriculum, and for Coordinator of the Southern Association of Colleges and Schools; and (6) West for Assistant Superintendent of Transportation, Facilities, and Student Management ("Assistant Superintendent").

Each recommendation was voted on by four of the five board members at the July 24 meeting.[4]  Melvilla West voted in favor of all the recommendations except for that of West, her husband, to which she abstained.  Verlin Jones voted for the recommendations of Gordon, Lewis, Ferguson, and West, but abstained from voting on the recommendations of Sturdivant and Jones, his wife.  Wayne Wilken voted in favor of the recommendations of Sturdivant, Gordon, Lewis, and Ferguson, but against the recommendation of West.  Eddie Almond, believing that Davis had not made the selections in accordance with the agreed-upon organizational chart, voted against every recommendation.  The upshot of the meeting was that Gordon, Lewis, and Ferguson were approved for the recommended positions, and Sturdivant, West, and Jones were not.

Disappointed with the outcome of the voting, Davis told the board that, in his view, his services were no longer needed.  Upon further deliberation in

---

[4] Janie Winters was not present at this meeting.

executive session, the board recognized the urgent need to fill the administrative positions as early in the school year as possible.  The members who had originally cast objecting votes therefore changed their minds, withdrew their objections, and voted for the recommendations proposed by Davis.  Other than West and Jones, both of whom continued to abstain from voting on their spouses, the board voted unanimously to approve Davis's recommendations.[5]

Gordon filed this lawsuit alleging that the District (through the board of education) and each member of the school board[6] discriminated against her in approving Davis's recommendations and passing her over for the promotions she sought.  She alleges that the District's decision was driven by racial animus toward white personnel.  The District, to the contrary, contends that race played no role in Davis's recommendations or in the votes of the board members; instead, it maintains that Gordon was not selected for the positions because she had poor leadership skills, she alienated and condescended to her colleagues, she lacked the administrative experience considered relevant, and because her academic background made her better suited to the duties of an Assistant Principal,

---

[5] The board agreed not to give West a raise, but rather to pay him for his service as Assistant Superintendent as though he were serving in the capacity of Director.

[6] Gordon named the board members in both their individual and official capacities.

a position in which she would be able to focus on issues of curriculum development and instruction.  The defendants have moved for summary judgment on all claims.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).  A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986). The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence.  *See* **Anderson**, 477 U.S. at 249.  Finally, "the evidence presented cannot consist of conclusory allegations or legal conclusions."  **Avirgan v. Hull**, 932 F.2d 1572, 1577 (11th Cir. 1991).

# III.  DISCUSSION

Gordon pursues her discrimination claims against the District and the members of the board of education under three statutes: 42 U.S.C.A. § 2000e ("Title VII"), 42 U.S.C.A. § 1983, and 42 U.S.C.A. § 1981.[7]  She seeks injunctive relief in addition to both compensatory and punitive damages.

Regarding Gordon's claims against the District, the Court makes one preliminary observation.  The District acts through its board of education. And under Georgia law, the board of education is authorized to take employment actions with respect to District personnel only on the recommendation of the Superintendent.  *See* O.C.G.A. § 20-2-211 (Lexis 2005).  The board has no independent authority to hire, fire, or otherwise assign District personnel. It is therefore the motive or intent of Interim Superintendent Davis in not recommending Gordon for Principal or Assistant Superintendent that is properly at issue in this case, as Davis is the relevant decisionmaker with respect to discrimination claims against the District.  For purposes of those claims, his motive or intent is attributable to the board of education and therefore the

---

[7] Her claims against the individual board members are brought under § 1981 and § 1983 and, appropriately, not under Title VII.  Because § 1983 "contains the sole cause of action against state actors for violations of § 1981," **Butts v. County of Volusia**, 222 F.3d 891, 892 (11th Cir. 2000), Gordon's § 1981 claims are dismissed as to all defendants.

District. *See **Harris v. Shelby County Bd. of Educ.**,* 99 F.3d 1078, 1084 n.3 (11th Cir. 1996).[8]

## A.  Employment Discrimination Under Title VII & § 1983

Though the Supreme Court has never expressly held as much, it is well settled in the Eleventh Circuit that claims of employment discrimination pursued under both Title VII and § 1983 share the same elements of proof and are subject to the same analytical framework. *See **Underwood v. Perry County Comm'n**,* No. 04-11713, 2005 WL 3272057 (11th Cir. Dec. 5, 2005) (applying the same framework and noting that "[w]hen section 1983 is used as a parallel remedy for violation . . . of Title VII, the elements of the two causes of action are the same.") (quoting ***Hardin v. Stynchcomb***, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982));

---

[8] Both parties invoke what is known in Title VII cases as the cat's paw theory of liability. *See **Llampallas v. Mini-Circuits, Lab, Inc.**,* 163 F.3d 1236, 1249 (11th Cir. 1998). But they do so for different purposes.  Gordon suggests that former Superintendent Hicks acted as the *de facto* decisionmaker when he originally came up with his never-proposed slate of recommendations.  She claims that his selections were based on race.  She further argues that, because Hicks was the true decisionmaker, his discriminatory intent should be attributed to Davis since Davis merely rubber-stamped Hicks's initial recommendations without giving the candidates independent consideration.  The District, on the other hand, notes that Davis is the District's relevant decisionmaker and that his motives are properly attributable to the board of education since the board is not authorized by law to make independent hiring, firing, or placement decisions with respect to District personnel.

The Court rejects Gordon's contention that Hicks was the "real" decisionmaker and that Davis, a mere sham decisionmaker, simply rubber-stamped Hicks's selections.  There is no evidence in the record to support that position.  The District is correct in recognizing that Davis's motivations are attributable to the board, though it need not rely on the cat's paw theory of liability to reach that conclusion.  *See **Shelby**,* 99 F.3d at 1084 n.3.

*see also* **Thigpen v. Bibb County, Ga. Sheriff's Dep't**, 223 F.3d 1231, 1239 (11th Cir. 2000); *but see* **St. Mary's Honor Center v. Hicks**, 509 U.S. 502, 506 n.1 (1993) (assuming, but not deciding, that "the **McDonnell Douglas** framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983."). The Court will therefore address these claims together, except where otherwise noted.

### Supporting Evidence:  Circumstantial v. Direct

Discrimination claims supported by circumstantial evidence are treated under the familiar burden-shifting framework set forth by the Supreme Court in **McDonnell Douglas Corp. v. Green**, 411 U.S. 792 (1973) and **Texas Dep't of Cmty. Affairs v. Burdine**, 450 U.S. 248 (1981).   Under that framework, the plaintiff bears the initial burden of establishing the elements of a prima facie case of discrimination.  The plaintiff's burden at this stage is not onerous.  Once the plaintiff has made out a prima facie case, an inference of discriminatory intent is created, and the burden then shifts to the defendant-employer to come forward with one or more legitimate, non-discriminatory reasons to justify its employment action.  The defendant-employer's burden is one of production, not persuasion.  Finally, "[i]f the employer meets this burden of production, the plaintiff then must

establish that each of the defendant's proffered reasons for [promoting] someone of a different race is pretextual." ***Bass v. Bd. of County Comm'rs, Orange County, Fla.***, 256 F.3d 1095, 1104 (11th Cir. 2001).

This burden-shifting framework applies only to discrimination claims supported by circumstantial evidence; claims which, by their nature, rely for success on inferential proof.   It does not apply to discrimination claims supported by direct evidence, however, because the presence of direct evidence eliminates the need for inferences altogether.   ***Id.***   Instead, "once a plaintiff produces direct evidence of a discriminatory motive, and the trier of fact accepts this testimony[,] the ultimate issue of discrimination is proved." ***Evans v. McClain of Ga., Inc.***, 131 F.3d 957, 962 (11th Cir. 1997) (internal quotation marks omitted). After that occurs, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." ***Id.***

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption." ***Bass***, 256 F.3d at 1105 (internal quotation marks omitted).   In keeping with this definition, "only the most blatant remarks, whose intent could be nothing other

than to discriminate on the basis of [race] [can] constitute direct evidence of discrimination." *Id.* Moreover, to be considered direct evidence, "statements of discriminatory intent . . . must be made by a person involved in the challenged decision." *Id.*

Gordon maintains that her claims are supported by both types of evidence.

## Direct Evidence

Gordon points to a number of statements made by two school-board members (Almond and Winters) and by former Superintendent Hicks as constituting direct evidence that the District did not promote her because of her race: (1) relying on the testimony of Hicks, Gordon identifies a statement Almond allegedly made in a school-board meeting (not one, however, relating to the selection of Gordon for Assistant Principal) to the effect that he would not vote on the recommendation of any school administrator "until he knew the color of the monkey." Hicks Dep., doc. 39, 60:6-12; (2) she again identifies a portion of Hicks's deposition testimony, in which he stated that during his tenure "[t]here were a number of racial overtones that were made by some Board members." Hicks Dep., doc. 39, 59:3-4; (3) she alleges that, according to Hicks, Almond and Winters stated on various occasions that white teachers were not capable of

teaching black students.  Hicks Dep., doc. 39, 67:7-68:3; (4) she alleges that Hicks, Almond, and Winters each stated that a black male should be the principal of the middle school so that the school's impressionable black youths would have a role model to look up to.  Jones Dep., doc. 34, 39:9-18; and finally, (5) Gordon alleges that Hicks told her in a face-to-face meeting that she would make a good principal, but that "the Board would [n]ever approve [her] . . . because they wanted a black male in that position."  Gordon Dep., doc. 27, 150:11-16.  Notably, however, Gordon makes no allegation that Interim Superintendent Davis, the school administrator who actually interviewed and considered the candidates and made the recommendations at issue here (*i.e.* the relevant decisionmaker), made any racially discriminatory references or comments, took into account racial criteria when making his recommendations, or otherwise acted with any trace of racial discrimination.

Under the prevailing definition of direct evidence employed in this Circuit,[9] the Court cannot conclude that the statements cited by Gordon constitute direct evidence that she was singled out by the District for racial discrimination.

---

[9] Judge Tjoflat has proposed an alternative, and less rigorous, definition, but so far as the Court is able to tell that definition has not garnered the support of any other judge in the Eleventh Circuit.  *See **Wright v. Southland Corp.**,* 187 F.3d 1287 (11th Cir. 1999).

This conclusion is compelled because, even taken as true, none of the statements are sufficient to prove a fact in issue (*i.e.* whether the District discriminated against Gordon) without inference or presumption.  Specifically, none of the statements are causally linked to Davis's recommendation and none have anything to say about Davis's motive or intent.  It therefore cannot be established without inference or presumption that the sentiments embodied in the statements actually motivated or influenced the decisionmaker responsible for recommending Gordon for Assistant Principal.  Nevertheless, the statements are not valueless; though not direct evidence, they may be considered circumstantial evidence of discrimination.

## Circumstantial Evidence

### 1.  The Prima Facie Case

To establish the prima facie elements of a failure-to-promote discrimination claim under Title VII or § 1983, a plaintiff must produce evidence that: "(1) he was qualified and applied for the position; (2) he was rejected despite his qualifications; and (3) other equally or less qualified employees who are not members of his race were hired."  ***Bass***, 256 F.3d at 1104.

Gordon has carried her prima facie burden.  First, as the District concedes, she is objectively qualified—in terms of her educational degrees and scholastic

background[10]—to serve in the two positions for which she applied.  Second, she was rejected for the positions despite her objective qualifications.  And, third, the positions Gordon sought were filled by two non-white employees, compared to whom she was equally objectively qualified.

Having made out a prima facie case, Gordon has successfully raised an inference of discriminatory intent.  *See* **Vessels**, 408 F.3d at 768.  The burden now shifts to the District to articulate one or more legitimate, non-discriminatory reasons why it did not choose Gordon for the administrative positions she sought.

## 2.  Legitimate, Non-Discriminatory Reasons

The District's burden at this stage is one of production, not persuasion.  It has been called "exceedingly light."  **Perryman v. Johnson Prods. Co.**, 698 F.2d 1138, 1142 (11th Cir. 1983).  "So long as the employer articulates 'a clear and reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production."  **Vessels**, 408 F.3d at 770.

The District maintains that Sturdivant was recommended for the Principal

---

[10] The District strenuously disagrees that Gordon was qualified for the position in other relevant—and ultimately determinative—respects.  The subjective reasons for which Gordon was rejected are most appropriately addressed at the second and third stages of the **McDonnell Douglas** analysis.  *See* **Vessels v. Atlanta Indep. Sch. Sys.**, 408 F.3d 763, 768-69 (11th Cir. 2005) ("[S]ubjective criteria [such as the plaintiff's leadership style] have no place in the plaintiff's initial prima facie case").

of Dooly County Middle School because he had leadership skills demonstrably superior to those of Gordon.  Davis Aff. ¶ 4, Ex. 11 to Defs.' Mot. Summ. J., doc. 25.  The District contends that Gordon had alienated a significant portion of the middle-school faculty during her previous stint there.  *Id.*  Accordingly, Davis believed she would not have made an effective leader because most of the alienated faculty members still worked at the school during the 2003-2004 academic year.  *Id.*  On the other hand, Davis felt that Sturdivant would be a good fit for the principalship because he had proven himself capable of getting along with, managing, and leading a group of people during his tenure as Assistant Principal at the high school in Dooly County.  Davis Dep., doc. 38, 38:10-12; 40:11-13.  Davis recommended Sturdivant for the job because, compared to Gordon, he had shown "considerably better leadership skills."  Davis Aff. ¶ 4, Ex. 11 to Defs.' Mot. Summ. J., doc. 25.

The District also contends that Gordon's off-putting nature was well known in the school system and that her temperament was generally ill-suited for effective leadership.  The District insists that she was not a good choice to be principal because "[h]er manner is abrupt, condescending, and disrespectful of those she views as intellectual inferiors."  Defs.' Br. Supp. Mot. Summ. J., Ex. 3 to doc. 25,

at 8.  According to a former supervisor, Gordon "acted and spoke as though she knew more than anyone, she was always right, and she had to have her way.  Even her tone of voice betrayed her lack of respect for those she considered inferior."  Carr Aff. ¶ 6, Ex. 4 to Mot. Summ. J., doc. 25.  Davis knew of these traits at the time the personnel decisions at issue were under consideration.  Davis Aff. ¶ 4, Ex. 11 to Defs.' Mot. Summ. J., doc. 25.

The Assistant Principal position, for which Gordon was ultimately chosen, focused to a large degree on curriculum design and instruction, and consequently did not require the same leadership and interpersonal skills associated with the principal's task of managing an entire faculty.   In Davis's opinion, Gordon's "academic knowledge" was a valuable asset, and he thought that as an Assistant Principal, she would be best situated to use that knowledge to serve the overall needs of the district.  Davis Aff. ¶ 4, Ex. 11 to Defs.' Mot. Summ. J., doc. 25.

With respect to the position of Assistant Superintendent of Transportation, Facilities, and Student Management—to which West was assigned—the District maintains that Gordon was not chosen because she lacked the particular administrative experience deemed necessary to the job.  Davis Aff. ¶ 4, Ex. 11 to Defs.' Mot. Summ. J., doc. 25.   According to Davis, the duties and

responsibilities of that position were very similar (save on a larger scale) to the ones required of West during his 14 years of experience as a principal and an assistant principal. *Id.* Davis, who had himself served as Assistant Superintendent, stated that the necessary responsibilities included handling "transportation to and from [ ] schools, maintenance of the schools, and student discipline." *Id.* Unlike West, Gordon did not have any experience dealing with these sorts of administrative tasks.

And as with the Principal position, Davis thought that recommending Gordon to serve as the Assistant Superintendent would deprive the District of the benefit of Gordon's substantial academic background and experience in terms of designing and implementing a successful curriculum. Davis Aff. ¶ 4, Ex. 11 to Defs.' Mot. Summ. J., doc. 25. He therefore determined that she could best serve the District's needs as an Assistant Principal.

Because the District has articulated "clear and reasonably specific," non-discriminatory reasons for not promoting Gordon to either position, it has discharged its burden of production at this stage of the analysis, and the presumption of discriminatory intent created by Gordon's prima facie case is eliminated.

### 3. Pretext

The ball is now back in Gordon's court. "To survive summary judgment, [she] must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the [District] were not its true reasons, but were a pretext for discrimination." *Vessels*, 408 F.3d 771. It is not enough that Gordon merely disagree with the District's reasons; rather, she must present evidence that "reveal[s] 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the [District's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Id.* (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). She must be able to point to "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

Gordon maintains that Davis's reasons for not recommending her are not worthy of credence because Davis sought out West for the vacancies before West expressed interest in either. She also claims that Davis made inconsistent statements during discovery regarding the method he used to evaluate the

candidates' qualifications.  In Gordon's view, the way West was selected, taken together with Davis's allegedly inconsistent testimony, creates a genuine issue of material fact on the issue of pretext.  After reviewing the evidence cited in support of her position, however, the Court finds no genuine issue of fact to be resolved at trial.  Stated differently, the evidence proffered by Gordon would not "allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason."  *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1275 n.4 (11th Cir. 2002).

Gordon contends that Davis considered West for the position of Assistant Superintendent even though West did not actively seek it.  Because Davis identified West as a good fit for the position before West realized it was available, Gordon argues that Davis's stated reason for recommending West to the board (because he had more relevant administrative experience than Gordon) is pretextual and that Davis instead sought West out simply to keep a white female from becoming Assistant Superintendent.  In Gordon's view, the way in which Davis went about considering who to recommend for the position raises suspicions about the veracity of his proffered reasons.  These suspicions, however, fall well short of revealing the sorts of weaknesses, implausibilities, or incoherencies necessary to

establish pretext.    Given West's superior qualifications for Assistant Superintendent, the Court is unable to say that Davis's actions (*i.e.* approaching West to gauge his interest in the job) are inconsistent with his stated intention of trying to fill the position with the best qualified individual.  He considered West for the job.  He then considered Gordon for the job.  In the end, he chose to recommend West.

Gordon next asserts that Davis's deposition testimony is inconsistent with his affidavit statement regarding the way he evaluated the candidates before making his recommendations.  This inconsistency, she contends, is evidence of pretext. The inconsistency relied upon appears to be of Gordon's own making, however, and Davis's statements do not call into question his proffered reasons for making the recommendations he did.  Davis testified in his deposition that he considered individuals based on their applications and interviews. Davis Dep., doc. 38, 23:19-22.  Gordon insists that Davis later "change[d] his testimony" in his affidavit by stating that his considerations were based on his observations of Gordon, Sturdivant, and West, and his familiarity with their reputations.   A review of Davis's deposition reveals that, in addition to the application and interview, he made his recommendations based on a number of factors, including his

observations of the candidates' ability to get along with people and to lead effectively. Davis Dep., doc. 38, 34-35; 40; 45-46. This testimony is consistent with the statements he made in his affidavit. The fact that Davis was not Gordon's formal supervisor does not mean, as she suggests, that he lacks personal knowledge of (and is therefore incompetent to testify about) her capabilities, her strengths and weaknesses, or the nature of her relations with other District personnel.

Importantly, Gordon offers no evidence to suggest that Davis considered, either implicitly or explicitly, the race of any of the individuals he recommended for the vacancies. She likewise does not make any effort to meet head-on the actual reasons offered by Davis in support of his recommendation: her lack of relevant administrative experience, her lack of interpersonal and leadership skills, and his desire, as Interim Superintendent, to place her in a position where her substantial academic-oriented background could best serve the needs of the District. She does not challenge or dispute the evidence that she had had difficulty working with her colleagues, that she was demeaning and condescending toward others, that she alienated a substantial portion of the middle school faculty, and that in Davis's sincerely held view the District would have been poorly served by having her academic background and expertise wasted in an administrative role that did not call for such skill.

Finding no evidence to indicate that Davis's proffered reasons are pretext for discrimination, the Court determines that Gordon has not created a genuine issue of material fact from which a reasonable juror could conclude that the reasons given are not the real reasons for Davis's recommendation.[11]  The District is therefore entitled to summary judgment on Gordon's discrimination claims.[12]

## B.  Individual Liability for Discrimination Under § 1983

Gordon has sued all of the members of the board of education in their individual and official capacities, alleging that they violated her rights under the Equal Protection Clause of the Fourteenth Amendment when they voted to approve Davis's recommendation of her for Assistant Principal.  However, Gordon has produced no evidence to support her contention that the board members cast their votes with the intent or purpose of discriminating against her based on her race.

---

[11] The discriminatory statements Gordon attributes to Hicks, Winters, and Almond (which the Court found above did not constitute direct evidence of discrimination) cannot be relied upon to cast doubt on Davis's proffered reasons because there is no evidence that, in making his recommendation of Gordon for Assistant Principal, Davis knew about, or was motivated or influenced by, those statements or the views they express.

[12] Because Gordon cannot carry her burden under the third portion of the *McDonnell Douglas* framework, thus entitling the District to summary judgment on her Title VII and § 1983 claims, the Court need not reach the District's mixed-motive affirmative defense, which is applicable only where the plaintiff is able to demonstrate that race (or some other illegitimate consideration) was a motivating factor in the challenged employment action.

-24-

By her own admission, board members Jones, Wilkin, and West have never singled her out for racial discrimination with respect to her employment (or otherwise).  Gordon Dep., doc. 27, 176:6-178:3.  Furthermore, board member Winters was not even present at the meeting during which the board voted on Davis's recommendations and, therefore, took no action whatever regarding Gordon's position as Assistant Principal.  That leaves only board member Almond.  Even assuming, as Gordon has alleged, that Almond made racially tinged comments at unspecified times during his tenure on the board, there is no evidence to suggest that the purpose of his vote at the July 24 meeting was to discriminate against Gordon on account of her race.

Discriminatory intent is the sine qua non of any valid Equal Protection claim.  *See* **Holton v. City of Thomasville Sch. Dist.**, 425 F.3d 1325, 1349 (11th Cir. 2005); *see also* **Washington v. Davis**, 426 U.S. 229, 240 (1976).  That intent has not been demonstrated here.  Thus, there is no genuine issue of material fact as to whether Gordon's equal-protection rights were violated, and the Court finds that the board members are entitled to judgment as a matter of law.  Accordingly, Gordon's discrimination claims against the board members are dismissed.

## IV.  CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment

(doc. 25) is hereby **GRANTED.**

SO ORDERED, this 28th day of December, 2005.


**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew